RENDERED: AUGUST 16, 2018
TO BE PUBLISHED

# Supreme Court of Kentucky FINAL

## 2017-SC-000261-MR

DATE 9/6/18 Kim Redmon, DC

MARC MCCOY                                                                    APPELLANT

|  |  |
|---|---|
| V. | ON APPEAL FROM HARDIN CIRCUIT COURT<br>HONORABLE KEN HOWARD, JUDGE<br>NO. 16-CR-00115 |

COMMONWEALTH OF KENTUCKY                                               APPELLEE

### OPINION OF THE COURT BY CHIEF JUSTICE MINTON

### AFFIRMING

A circuit court jury convicted Marc Daniel McCoy of complicity to the kidnapping and the first-degree assault of Dealynn O'Connor and complicity to theft by unlawful taking, over $500. Following the jury's recommendation, the trial court entered judgment of conviction and sentenced McCoy to a total of 20 years' imprisonment. McCoy now appeals from the judgment as a matter of right,[1] raising two issues for review. Finding no reversible error, we affirm the judgment.

---

[1] Ky. Const. § 110(2)(b).

# I. BACKGROUND.

Several people, including McCoy and O'Connor, came and went over the span of two days to and from a trailer in Hardin County, Kentucky. The events that came about during that get-together ended in criminal charges and separate grand jury indictments against five people, including McCoy, who was charged with complicity to the kidnapping and the first-degree assault of O'Connor and complicity to theft by unlawful taking, over $500. Three of the five defendants pleaded guilty before trial and testified against McCoy and a co-defendant, Trevor Brown Jr.,[2] in a joint jury trial in which both McCoy and Brown were convicted.

A concise summary of the facts giving rise to the charges against McCoy is nearly impossible to relate because of the many actors involved and the variations in stories. Testimony at trial revealed that an argument arose at the Hardin County trailer between O'Connor and one or more of her assailants. That argument escalated into a physical altercation, during which one of the assailants took money from O'Connor's purse. During the altercation, an assailant asked for help, in response to which McCoy grabbed O'Connor by the shirt and yanked her onto a kitchen counter a couple of times, slamming her back against the kitchen counter and knocking the wind out of her. McCoy then asked O'Connor, "where's the drugs and the money," and then kicked her

---

[2] By separate opinion rendered today, we affirm the judgment of conviction and sentence of McCoy's co-defendant. *Brown v. Commonwealth*, 2018-SC-000117-MR (Ky. 2018).

hard in the head.[3] McCoy and another assailant then threw O'Connor into the bathroom at the trailer.

One of the assailants then telephoned Brown, described what had happened to O'Connor, and asked him for help. Brown responded by coming to the trailer, where the assailant introduced McCoy and Brown to each other. The assailant then testified that she told McCoy and Brown to "just take [O'Connor] somewhere, drop her off ... with ... her car." At this point, McCoy and Brown removed O'Connor—who was bound and gagged, wrapped in a bedsheet, and hooded with a pillowcase over her head—and put her into her automobile.

Testimony also revealed that, at this point, Brown had in his possession a paper towel containing jewelry stolen from O'Connor. Brown gave it to McCoy. McCoy (the driver), Brown, and O'Connor drove to a bridge spanning the Ohio River in adjoing Meade County, Kentucky. Upon arriving at the bridge, Brown exited the vehicle with O'Conner and stabbed her three times.

Shortly thereafter, an officer, responding to a 911 call by a passerby who found the victim, encountered McCoy walking along a road. The officer detained McCoy and patted him down, finding the stolen jewelry. McCoy gave the officer false information about his identity, the origin and his receipt of the jewelry, and his whereabouts during the events in question.

---

[3] There is testimonial inconsistency as to whether McCoy truly kicked O'Connor in the head.

3

McCoy was then interviewed by Hardin County detectives. He initially lied to the detectives about his whereabouts during the events of this case. Eventually, McCoy recanted and admitted his involvement. He admitted that Brown had given him the paper towel containing O'Conner's jewelry but denied knowing that jewelry was in the towel. McCoy also admitted to having driven to a "rural road called Pleasant Grove Road," left O'Connor's car "on some vacant property ... behind a brush pile" where he threw the car keys, which were not recovered, into some weeds.

## II. ANALYSIS.

### A. The trial court did not abuse its discretion when it denied McCoy's motion for a continuance.

McCoy first argues that the trial court erred when it denied his requested continuances of the jury trial. The parties dispute the preservation of this issue, but the Commonwealth's argument on that point is meritless. There is no question that McCoy moved for a continuance both six days before trial and the morning of trial, making at some point the same two arguments he now makes on appeal. So this issue is preserved for our review.

Kentucky Rules of Criminal Procedure ("RCr") 9.04 states, "The court, upon motion and sufficient cause shown by either party, may grant a postponement of the hearing or trial." The trial court's decision as to whether to grant or deny a continuance is reviewed for an abuse of discretion.[4] "The test

---

[4] *Snodgrass v. Commonwealth*, 814 S.W.2d 579, 581 (Ky. 1991) (overruled by *Lawson v. Commonwealth*, 53 S.W.3d 534 (Ky. 2001) on a different issue).

for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[5]

"Whether a continuance is appropriate in a particular case depends upon the unique facts and circumstances of that case."[6] "Factors the trial court is to consider in exercising its discretion are: length of delay; previous continuances; inconvenience to litigants, witnesses, counsel and the court; whether the delay is purposeful or is caused by the accused; availability of other competent counsel; complexity of the case; and whether denying the continuance will lead to identifiable prejudice."[7]

McCoy argues that the trial court should have granted his motions for a continuance for two reasons. First, shortly before trial, three of the five co-defendants decided to plead guilty in exchange for their testimony against McCoy. McCoy argues that this late development forced his counsel to change defenses to prepare for the co-defendants' testimony. Second, the Commonwealth disclosed relevant fingerprint evidence implicating McCoy six days before trial. McCoy argues that he did not have enough time to have an expert review the fingerprint evidence. But, both of McCoy's reasons for a continuance fail.

---

[5] *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000) (citing *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999)).

[6] *Snodgrass*, 814 S.W.2d at 581 (citing *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)).

[7] *Snodgrass*, 814 S.W.2d at 581 (citing *Wilson v. Mintzes*, 761 F.2d 275, 281 (6th Cir. 1985)).

Responding to McCoy's motion for a continuance based on the eve-of-trial entry of the co-defendants' guilty pleas, the trial court acknowledged that the guilty pleas and statements implicating McCoy were made near trial. But the trial court attempted to ascertain how McCoy would be prejudiced by the guilty pleas and co-defendants' statements. McCoy's counsel then stated, "Judge, based on my review of the statements and the evidence, in all candor, I don't think there's a lot of variances as far as those details, but nevertheless, given the situation, I would renew my motion." McCoy's counsel also acknowledged that, to his knowledge, there was no substantial change in the theory of the Commonwealth's case based on the statements given by the pleading co-defendants. Lastly, we note that the trial court offered McCoy the opportunity to submit a written motion, with support, for a continuance, which McCoy did not do.

We find nothing unreasonable, arbitrary, unfair, or unsupported by sound legal principles in the trial court's ruling. As McCoy's counsel indicated, the statements from the pleading co-defendants did not result in any new or surprising information for the defense. At no point has McCoy articulated how he was prejudiced by the statements of the pleading co-defendants—he simply states that this late development, in and of itself, prejudiced him. But, we agree with the trial court's sentiment that it is the responsibility of defense counsel to prepare for such a change in events. We additionally question any prejudice McCoy experienced because of this development when his counsel chose not to

submit a written motion further explaining his position despite the trial court's invitation.

McCoy additionally based his request for a continuance on the purportedly late discovery received, i.e. fingerprint evidence implicating his involvement in this case. McCoy argued that he received the fingerprint evidence just six days before trial and did not have time to have an expert review it to challenge the Commonwealth's use of it. But, as both the Commonwealth and trial court noted, the Commonwealth's fingerprint-evidence expert was disclosed several months before the March 20 trial date. The trial court noted that this discourse should have alerted McCoy to the Commonwealth's use of the fingerprint evidence and should have prompted an earlier request from McCoy for this information than the one he made the month before trial. Nonetheless, the trial court authorized funds for McCoy to hire a fingerprint expert to review the fingerprint evidence. The trial court promised to adjust the trial schedule to afford McCoy the opportunity to present any resulting exculpatory evidence.

Again, we fail to see how the trial court acted unreasonably, arbitrarily, unfairly, or in a way unsupported by sound legal principles. As the trial court noted, McCoy knew for some time that likely inculpatory fingerprint evidence existed and did not act on that evidence until the month before trial. Although McCoy did not receive the evidence until six days before trial, the trial court was willing to make accommodations to ensure that any exculpatory proof McCoy wanted to put on was presented at trial. Lastly, McCoy has not

identified what purportedly exculpatory proof he could not offer at trial because of the events that transpired, further supporting the trial court's characterization of this argument as "pure speculation."

As such, the trial court did not abuse its discretion when denying McCoy's motions for continuances based on these rationales.

## B. The trial court did not err when it denied McCoy's motions for directed verdict on his charges.

McCoy next argues that the trial court should have granted McCoy's motions for directed verdict on his Complicity to (1) Kidnapping, (2) First-Degree Assault, and (3) Theft by Unlawful Taking charges. Preservation of this issue is disputed.

McCoy appears to make two arguments. His first argument is a general argument that, based on the evidence adduced at trial, it was clearly unreasonable for the jury to find guilt. His second argument is that O'Connor suffered no "serious physical injury" in this case, negating the convictions predicated on the satisfaction of this element.

If we find McCoy's arguments to be preserved, "[o]n appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilty, only then the defendant is entitled to a directed verdict of acquittal."[8] If we find McCoy's arguments to be unpreserved, we shall review for palpable error.[9] Palpable error requires a showing that the

---

[8] *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991) (citing *Commonwealth v. Sawhill*, 660 S.W.2d 3 (Ky. 1983)).

[9] RCr 10.26.

alleged error affected the "substantial rights" of a defendant, where relief may be granted "upon a determination that manifest injustice has resulted from the error."[10] To find that "manifest injustice has resulted from the error," this Court must conclude that the error so seriously affected the fairness, integrity, or public reputation of the proceeding as to be "shocking or jurisprudentially intolerable."[11]

We shall address each conviction in turn. Because McCoy was convicted of Complicity to multiple offenses, we note the general definition of Complicity: "A person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, he: (a) solicits, commands, or engages in a conspiracy with such other person to commit the offense; or (b) aids, counsel, or attempts to aid such person in planning or committing the offense."[12] We also note in our review of this issue: "Intent can be inferred from the actions of an accused and the surrounding circumstances. The jury has wide latitude in inferring intent from the evidence."[13]

---

[10] *Id.*

[11] *Martin v. Commonwealth*, 207 S.W.3d 1, 4 (Ky. 2006).

[12] KRS 502.020(1).

[13] *Anastasi v. Commonwealth*, 754 S.W.2d 860, 862 (Ky. 1988) (citing *Rayburn v. Commonwealth*, 476 S.W.2d 187 (Ky. 1972)).

### 1. *Complicity to Kidnapping*

At trial, McCoy moved for a directed verdict on his Complicity to Kidnapping charge. The Commonwealth does not dispute the preservation of the entirety of this issue.

"A person is guilty of kidnapping when he unlawfully restrains another person and when his intent is: ... (b) to accomplish or to advance the commission of a felony; or (c) to inflict bodily injury or to terrorize the victim or another ... ."[14] "Kidnapping is a Class A felony when the victim is released alive but the victim has suffered serious physical injury during the kidnapping, or as a result of not being released in a safe place, or as a result of being released in any circumstances which are intended, known or should have been known to cause or lead to serious physical injury."[15]

McCoy's argument, that the jury's finding of guilt on McCoy's complicity to kidnapping charge was "clearly unreasonable," is meritless. McCoy assisted the other assailants in restraining O'Connor, throwing her against a kitchen counter twice and possibly kicking her in the head, and stowing her in a bathroom. McCoy and Brown were then directed by one of the assailants to "just take her somewhere, drop her off ... with ... her car." McCoy and Brown proceeded to do so and took the victim—who was bound and gagged, wrapped in a bedsheet, and hooded with a pillowcase over her head—away, traveling to

---

[14] KRS 509.040(1).

[15] KRS 509.040(2).

10

a bridge in a neighboring county. Finally, we note the exchange at trial between the Commonwealth and McCoy on the cross-examination of McCoy:

> **Commonwealth**: You knew she had been kidnapped or was being abducted? You're not stupid, whether you were afraid or not, she was being kidnapped right?
>
> **McCoy**: (silence)
>
> **Commonwealth**: Held against her will.
>
> **McCoy**: I guess you could say that, yes.

On these facts, we find it completely meritless to argue that the jury was "clearly unreasonable" in finding McCoy guilty of Complicity to Kidnapping.

McCoy also argues that O'Connor never suffered a "serious physical injury," one of the elements that, if found satisfied, enhances kidnapping to a Class A felony. KRS 500.080(15) defines *serious physical injury* to mean "physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ."

We note at the outset of our analysis that O'Connor died in an unrelated incident before McCoy's trial, so she could not provide testimony about her injuries. In fact, the only evidence at trial as to O'Connor's injuries amounted to the knowledge that she was stabbed—pictures showing the injury—and medical testimony provided by an expert witness testifying solely based on medical records.

It is difficult to say that O'Connor's injuries here qualify under the serious and prolonged disfigurement, prolonged impairment of health, or

11

prolonged loss or impairment of the function of any bodily organ prongs. In fact, the Commonwealth does not attempt to argue satisfaction of these prongs of the *serious physical injury* test. This dispute then comes down to whether it was clearly unreasonable for a jury to believe that, based on the evidence adduced at trial, O'Connor suffered a "physical injury which creates a substantial risk of death."

The evidence at trial was that Brown stabbed O'Connor three times. Because of the stabbing, O'Connor suffered a punctured lung, creating a hole in the lung and causing a pneumothorax, also known as a collapsed lung. Because of this injury, O'Connor received treatment at a Level One trauma hospital. She was hospitalized for three days, had a tube inserted into her torso, and remained hospitalized until she went a full day without her lung collapsing upon removal of the chest tube. Medical testimony at trial revealed that a pneumothorax, if untreated, can lead to respiratory arrest. The testifying doctor also stated that any pneumothorax can become a "tension pneumothorax," which occurs when air becomes trapped in the chest wall and pushes the heart to the opposite side of the body. The doctor testified that this situation is "an absolute surgical emergency. People will die." The doctor testified that in O'Connor's case, the pneumothorax was fortunately detected quickly.

We cannot say that the trial court erred in denying McCoy's motion for a directed verdict because it was not clearly unreasonable for a jury to find the stab wound causing a pneumothorax to be a *serious physical injury*. As stated,

12

*serious physical injury* can mean a "physical injury which creates a substantial risk of death."[16] Medical testimony at trial revealed that O'Connor was transferred to a level one trauma hospital and that her injury could have led to respiratory arrest and a tension pneumothorax, both of which can cause death. O'Connor was hospitalized for three days and monitored for one day without the chest tube before she could be released. From the evidence presented at trial, we cannot say that it was "clearly unreasonable" for a jury to find that, in and of itself, a pneumothorax, described by the evidence as potentially fatal, constituted a physical injury creating a substantial risk of death.

Our holding here is supported by the holding of an unpublished Court of Appeals case that our research shows is the only other time a Kentucky court addressed the issue of whether a pneumothorax constitutes a serious physical injury under the "physical injury creating a substantial risk of death" prong.[17] Under similar facts and witness testimony, the Court of Appeals in *Howard* found that a pneumothorax, in and of itself, does constitute a serious physical injury, because it constitutes a "physical injury creating a substantial risk of death."[18] And other jurisdictions with statutory definitions of *serious physical*

---

[16] KRS 500.080(15).

[17] *Howard v. Commonwealth*, No. 2007-CA-001907-MR, 2008 WL 4822290 (Ky. App. Nov. 7, 2008).

[18] *Id.* at *3.

*injury* identical to Kentucky's that have taken up this issue have also found the same.[19]

For the reasons stated above, the trial court did not err when denying McCoy's motion for a directed verdict on the Complicity to Kidnapping charge.

### 2. *Complicity to First-Degree Assault*

The jury also found McCoy guilty of Complicity to First-Degree Assault. The Commonwealth disputes the preservation of this issue, arguing that McCoy only argued that there was no common plan or scheme to attempt to murder O'Connor, not that the assault did not rise to the level of serious physical injury. But McCoy points out that he was charged with Complicity to Attempted Murder, not the lesser-included offense of First-Degree Assault, of which the jury found him guilty, so there was no reason to dispute the serious-physical-injury element of first-degree assault. And McCoy notes that one of his main arguments on his motions for directed verdict in general was that O'Connor did not suffer a serious physical injury. We think that the entirety of this argument should be reviewed on appeal as a preserved error in fairness to McCoy.

"A person is guilty of assault in the first degree when: (a) He intentionally causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument; or (b) Under circumstances manifesting extreme

---

[19] *See e.g. People v. Thompson*, 224 A.D.2d 646, 647 (N.Y. App. 1996); *State v. Barnes*, 714 S.W.2d 811, 813 (Mo. App. 1986); *Montgomery v. State*, No. 14-16-00365-CR, 2017 WL 2484375, at *3 (Tex. App. June 8, 2017)). S*mith v. State*, No. CACR 12-396, 2012 WL 5451807, at *3 (Ark. App. Nov. 7, 2012).

14

indifference to the value of human life he wantonly engages in conduct which creates a grave risk of death to another and thereby causes serious physical injury to another person."[20]

As noted, McCoy assisted the other assailants in restraining O'Connor, throwing her against a kitchen counter twice and possibly kicking her in the head, and stowing her in a bathroom. McCoy and Brown were then directed by one of the assailants to "just take her somewhere, drop her off ... with ... her car." McCoy and Brown proceeded to do so and took the victim-who was bound and gagged, wrapped in a bedsheet, and hooded with a pillowcase over her head—away. McCoy and Brown then drove to and stopped at a bridge in a neighboring county, where Brown and O'Connor exited the vehicle. McCoy testified that he knew "there was a serious ordeal going on," that he was scared, that he thought stopping on the bridge was "very odd," and that he was "worried about [O'Connor]." Brown then stabbed O'Connor, puncturing her lung. McCoy and Brown then fled the scene. McCoy ditched O'Connor's car behind some brush in an abandoned area, throwing away the keys in the process.

On these facts, we find meritless the argument that it was "clearly unreasonable" for the jury to find McCoy guilty of Complicity to First-Degree Assault. Additionally, we have already determined that the pneumothorax O'Connor suffered because of the stabbing can be properly characterized as a

---

[20] KRS 508.010(1).

15

serious physical injury. So we conclude that the trial court did not err in denying McCoy's motion for directed verdict on his Complicity to First-Degree Assault charge.

### 3. *Complicity to Theft by Unlawful Taking of O'Connor's Property*

Lastly, McCoy argues that the trial court erred when it denied his motion for a directed verdict on his Complicity to Theft by Unlawful Taking. At trial, McCoy specifically moved for a directed verdict on the premise that "there's been no evidence that [McCoy] himself took [O'Connor's] jewelry or the money by force or threat of physical force." The Commonwealth responded, "We know that he was in possession of her jewelry, that he admitted being in possession of it. I think it's clear that he was in possession of her vehicle at one point." Based on the argument the trial court heard, we will treat this issue as preserved.

Even so, as we have found McCoy's other arguments to be, we find his contention that the trial court erred when denying his motion for directed verdict on the Complicity to Theft by Unlawful Taking charge completely meritless. "[A] person is guilty of theft by unlawful taking or disposition when he unlawfully: (a) Takes or exercises control over movable property of another with intent to deprive him thereof ... ."[21] "'Deprive' means: (a) To withhold property of another permanently ... ; or (b) To dispose of the property so as to make it unlikely that the owner will recover it."[22]

---

[21] KRS 514.030(1).

[22] KRS 514.010(1).

The jury instructions afforded the jury three different pieces of property the jury could have found McCoy to have been complicit in stealing, i.e. "money or jewelry or car." Officers found O'Connor's stolen jewelry in the possession of McCoy, the stolen jewelry that was testified to as being given to McCoy by Brown. Testimony revealed that McCoy asked O'Connor where her drugs and money were. McCoy was the driver of O'Connor's car during their kidnapping of O'Connor. McCoy admitted at trial that he pulled the car off on the side of the road, parked it behind some brush in an abandoned area, and left, but not before he threw away the keys.

Once again, the circumstances of this case support the trial court's denial of McCoy's motion for directed verdict on his Complicity to Theft by Unlawful Taking charge. Simply put, the trial court did not err in denying McCoy's motion for a directed verdict in his Complicity to Theft by Unlawful Taking charge, nor in its denial of McCoy's directed verdict motions on his other charges, as on none of these charges was it "clearly unreasonable" for the jury to have found guilt.

### III.    CONCLUSION

Finding no reversible error, we affirm the entirety of the judgment.

All sitting. All concur.

17

COUNSEL FOR APPELLANT:

Roy Alyette Durham II
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Leilani K.M. Martiin
Assistant Attorney General