**COMMONWEALTH of Kentucky, Appellant,**

v.

**Charles BUSSELL, Appellee.**

**No. 2006–SC–000001–MR.**

Supreme Court of Kentucky.

June 21, 2007.

As Modified Aug. 30, 2007.

Susan M.J. Martin, Assistant Public Advocate, Owensboro, David Hare Harshaw, III, Assistant Public Advocate, LaGrange, Theodore S. Shouse, Assistant Public Advocate, Shepherdsville, Counsel for Appellant.

Gregory D. Stumbo, Attorney General of Kentucky, David A. Smith, Assistant Attorney General, Frankfort, Counsel for Appellee.

## OPINION OF THE COURT

The Commonwealth of Kentucky appeals from an order of the Christian Cir-

cuit Court vacating Appellee's, Charles Bussell's, death sentence and granting him a new trial. This case has been before this Court on several previous occasions, and thus a detailed discussion of the facts is unnecessary, except as is necessary to articulate the issues on this appeal.

In 1991, Bussell was convicted of the December 1, 1990, robbery and murder of Sue Lail. He was sentenced to death and his conviction and sentence were affirmed upon direct appeal to this Court.[1] Thereafter, we rejected Bussell's attempts[2] to delay the filing of an RCr 11.42 motion in the face of the governor's death warrant.[3] And, in 2004, this Court denied the Commonwealth's petition for a writ of prohibition in *Commonwealth v. Boteler.*[4]

The matter before us began on March 26, 1996, when Bussell moved the Christian Circuit Court for relief pursuant to RCr 11.42, alleging numerous *Brady*[5] violations and alleging ineffective assistance of counsel. Judge Charles Boteler was assigned as Special Judge. After various legal maneuvers, Judge Boteler granted an evidentiary hearing, which lasted nine days over the course of more than a year and which involved the testimony of sixty-four witnesses. On December 28, 2005, Judge Boteler granted Bussell a new trial. It is from this order that the Commonwealth appeals, arguing that the trial court committed several errors, *viz.*, (1) that it erred in granting a new trial based on alleged *Brady* violations, and (2) that it erred in finding that Bussell was deprived of effective assistance of counsel during the penalty phase of his trial.

## I. Alleged *Brady* violations.

As a reviewing court, on this RCr 11.42 appeal, we must defer to the findings of fact and determinations of witness credibility made by the trial judge.[6] Thus, unless the trial court's findings of fact are clearly erroneous, those findings must stand.[7]

In *Brady v. Maryland,*[8] the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[9] Under the *Brady* doctrine, evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have

1. *Bussell v. Commonwealth*, 882 S.W.2d 111 (Ky.1994), *cert. denied*, 513 U.S. 1174, 115 S.Ct. 1154, 130 L.Ed.2d 1111 (1995), *rehearing denied*, 514 U.S. 1079, 115 S.Ct. 1729, 131 L.Ed.2d 586 (1995).

2. Appellee's attorneys filed a "notice of intent" to file an RCr 11.42 motion as well as several motions to disqualify Judge White, the judge who had presided over the case, and a pre-filing request for "post-conviction discovery," which is not authorized under our rules.

3. *Bowling v. Commonwealth*, 926 S.W.2d 667 (Ky.1996).

4. No.2004–SC–0184–MR (April 22, 2004) (unpublished).

5. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

6. *Haight v. Commonwealth*, 41 S.W.3d 436, 442 (Ky.2001) (*citing Sanborn v. Commonwealth*, 975 S.W.2d 905 (Ky.1998); *McQueen v. Commonwealth*, 721 S.W.2d 694 (Ky.1986); *McQueen v. Scroggy*, 99 F.3d 1302 (6th Cir. 1996)).

7. *Bowling v. Commonwealth*, 80 S.W.3d 405 (Ky.2002), *cert. denied*, 538 U.S. 931, 123 S.Ct. 1587, 155 L.Ed.2d 327 (2003).

8. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.

9. *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97.

been different."[10] This Court reviews *de novo* whether the particular material at issue falls under *Brady*.[11] A "reasonable probability" may be defined as "a probability sufficient to undermine confidence in the outcome."[12]

 The duty to disclose exculpatory evidence is applicable regardless of whether or not there has been a request by the accused,[13] and the duty to disclose encompasses impeachment as well as other exculpatory evidence.[14] *Brady* only applies to information "which had been known to the prosecution but unknown to the defense."[15] With these guidelines in mind, we will examine each argument propounded by Appellant, the Commonwealth, disputing the existence of *Brady* violations.

In his RCr 11.42 motion, Bussell alleged that the Commonwealth failed to turn over to his trial counsel exculpatory evidence in violation of *Brady*. Specifically, Bussell claimed the Commonwealth failed to disclose numerous police reports in violation of *Brady* and the trial court's discovery order entered September 6, 1991. This order required the Commonwealth to disclose all police reports and statements of witnesses expected to testify. In its order granting Bussell a new trial, the circuit court found that the undisclosed police reports would have suggested the possibility of an alternate suspect in Mrs. Lail's death.

Six of the nine police reports found to have been undisclosed to the defense were compiled by Detective Mary Martins of the Hopkinsville Police Department. The reports disclosed the following information: (1) report on December 4, 1990, that there were new pry marks on the outside and inner portions of the door leading to screen portion of Lail's home as well as a broken lock on the door, signs suggesting forced entry; (2) report on December 5, 1990, indicating a plaster cast of a tire print found in Lail's yard; (3) report on December 11, 1990, memorializing Martins' conversation with an employee of a gas company who saw Lail the day before she disappeared and indicating that Lail's gas bill was paid December 3, 1990, two days after she disappeared; (4) report on January 19, 1991, based on statements from a confidential informant, and suggesting two other possible suspects in Lail's death; (5) report on January 22, 1991, reflecting a conversation Martins had with Don Bilyeau, a store owner in the area, in which Bilyeau reported that the black male he had seen in the area of Lail's house on the day of her disappearance had just been in his store; and (6) report on February 24, 1991, reflecting a conversation Martins had with Brian Cunningham, an employee of a local radio station who advised Martins that he checked a transmitter daily near the place where Lail's body was found.

The three remaining police reports discussed by the circuit court contained the following: (1) December 5, 1990, report that Lail had just had new carpet installed and, as a result, her front door would not

**10.** *Kyles v. Whitley*, 514 U.S. 419, 433–34, 115 S.Ct. 1555, 1565–66, 131 L.Ed.2d 490 (1995); *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).

**11.** *United States v. Corrado*, 227 F.3d 528, 538 (6th Cir.2000).

**12.** *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984).

**13.** *Untied States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976).

**14.** *Bagley*, 473 U.S. at 676, 105 S.Ct. at 3380.

**15.** *Id.* at 103, 96 S.Ct. at 2397.

close, suggesting easy entry with minimal force; (2) December 8, 1990, report where Don Bilyeau stated that he saw a black male or someone other than Bussell walking up Lail's driveway or her neighbor's driveway at about 4:00 p.m. on or about the day Lail disappeared; and (3) January 3, 1991, report in which Christian County Sheriff's deputy Bobby Dale Williams stated that a confidential informant had reported seeing a red GMC pickup backed up to Lail's home between 11:00 p.m. and 11:30 p.m. near the night of December 1, 1990.

At the RCr 11.42 hearing, the court heard testimony from circuit judge John Atkins, who at the time of Bussell's trial was the prosecutor who tried the case. The court also heard the testimony of Rob Embry, first-chair defense trial counsel, and Delissa Milburn, second-chair defense trial counsel.

Judge Atkins testified that, after the passage of thirteen years, he had no specific recollection of whether the police failed to provide him with any particular items of discovery or exculpatory evidence during his prosecution of Bussell or whether he had failed to turn over any items of discovery or exculpatory evidence. Embry, a convicted felon by the time of Bussell's evidentiary hearing on his RCr 11.42 motion, testified that he did not remember seeing or receiving several of the police reports during his defense of Bussell. However, Milburn, who assisted Embry in Bussell's defense, testified that at least after the September 6, 1991, discovery order was entered, there was no violation of the discovery rules or the discovery order and that to her knowledge the defense had

received "everything [they] had asked for" by the day the trial began on November 18, 1991.

The Commonwealth contends that the trial court erred in accepting the testimony of a convicted felon, Embry, over that of Judge Atkins, and that the trial court completely disregarded Milburn's testimony on the matter. While the Commonwealth is correct that the burden is on the defendant to prove that evidence favorable to him was withheld and to show that there is a reasonable probability the result of the trial would have been different had the exculpatory evidence been disclosed to the defense,[16] we cannot agree that Judge Boteler erred in this case. We are ever mindful that the trial court is in the best position to determine the credibility of witnesses and this Court should not second-guess credibility determinations.[17] The circuit court found that the evidence presented at the RCr 11.42 hearing "clearly establishes that more likely than not these nine reports were never disclosed to [Bussell's] defense team." This finding is conclusive.

■ Whether the evidence withheld was material and met the standard of reasonable probability of a different result at trial, we rely on *Kyles v. Whitley*[18] as follows:

> While the definition of *Bagley*[19] materiality in terms of the cumulative effect of suppression must accordingly be seen as leaving the government with a degree of discretion, it must also be understood as imposing a corresponding burden.... [T]he prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge

16. *Sanders v. Commonwealth,* 89 S.W.3d 380, 385 (Ky.2002).

17. See *Haight,* supra.

18. 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490.

19. *Bagley,* 473 U.S. 667, 105 S.Ct. 3375.

the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached. *This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.* But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, *see Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–1197), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.[20]

Under the totality of the circumstances as found by the trial court, we agree that those reports known to the prosecution and withheld for whatever reason were material to Bussell's guilt. Moreover, while not every police report discussed during the evidentiary hearing was exculpatory or was otherwise required to be disclosed, the cumulative effect of the information contained in those reports certainly suggests a reasonable probability that had the information been disclosed, the outcome of Bussell's trial would have been different. And, under the rationale set forth in *Kyles, supra,* the prosecutor in this case was under a concomitant "duty to learn of any favorable evidence known to . . . the police." *Id.*

Furthermore, we disagree with the Commonwealth's assertion that " 'alternative suspect' information is not exculpatory unless it eliminates the defendant as the culprit." In *Beaty v. Commonwealth,*[21] this Court held that "a defendant 'has the right to introduce evidence that another person committed the offense with which he is charged,'" and that this right may be infringed only where the defense theory is unsupported or far-fetched, as this may confuse or mislead the jury.[22] Additionally, the test set forth in *Brady* requires only that the court find the undisclosed evidence to be material to the defendant's guilt or punishment.[23] Thus, exculpatory evidence must only meet the requirement established for "materiality"—that is, there must be a "reasonable probability" that had the evidence been disclosed to the defendant, the outcome of the trial would have been different.[24]

The court held that the undisclosed reports were material and that "the information contained in these reports are favorable to [Bussell] pursuant to *Brady.*" Thus it concluded that the undisclosed reports undermined confidence in the outcome of the trial, denying Bussell's right to a fair trial. The court considered the reports as a collective pursuant to *Kyles, supra,* and found that the reports "could have been used to develop a rational defense, which [Bussell] failed to present in November of 1991." We perceive no error in the trial court's ruling with regard to its finding that a *Brady* violation occurred in Bussell's case, and we note that this ruling does not imply bad faith on the part of the Commonwealth in failing to disclose the reports.[25] Moreover, the *Brady* violation

---

**20.** *Kyles,* 514 U.S. at 437–38, 115 S.Ct. at 1567–68 (emphasis added).

**21.** 125 S.W.3d 196, 207 (Ky.2003) (*quoting Eldred v. Commonwealth,* 906 S.W.2d 694, 705 (Ky.1994)).

**22.** *See id.; see also Commonwealth v. Maddox,* 955 S.W.2d 718, 721 (Ky.1997).

**23.** *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97.

**24.** *Kyles,* 514 U.S. at 433–34, 115 S.Ct. at 1565–66. *See also Metcalf v. Commonwealth,* 158 S.W.3d 740, 746 (Ky.2005).

**25.** *See Brady,* 373 U.S. at 88, 83 S.Ct. at 1197 (holding that suppression of evidence favorable to the accused upon request violates due process, irrespective of the good faith or bad faith of the prosecution).

in this case was compounded by the ineffective assistance of Bussell's trial counsel.

## II. Allegations of Ineffective assistance of counsel.

The standard by which we measure ineffective assistance of counsel is found in *Strickland v. Washington.*[26] A claim of ineffective assistance of counsel requires a showing that counsel's performance "fell below an objective standard of reasonableness,"[27] and was so prejudicial that the defendant has been deprived "of a fair trial and reasonable result."[28] "Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would probably have won."[29]

Thus, Bussell must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[30] The "reasonable probability" standard of *Strickland* is the same "reasonable probability" standard used to prove a *Brady* violation, *viz.*, a "probability sufficient to undermine confidence in the outcome."[31] However, the purpose of RCr 11.42 is not to provide an opportunity to conduct a fishing expedition for grievances, but rather to "provide a forum for known grievances."[32]

There is "a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance."[33] As a reviewing court, we "must focus on the totality of evidence before the judge or jury and assess the overall performance of counsel throughout the case in order to determine whether the identified acts or omissions overcome the presumption that counsel rendered reasonable professional assistance."[34] As a reviewing court, we must defer to the findings of fact and determinations of witness credibility made by the trial judge.[35] Moreover, in an RCr 11.42 proceeding, the movant has the burden of establishing that he was "deprived of some substantial right which would justify the extraordinary relief afforded by the post-conviction proceeding."[36]

In Bussell's RCr 11.42 motion, he alleged that, during the guilt phase of his trial, Embry failed to investigate and interview prospective witnesses and that he failed to retain experts to refute scientific evidence proffered by the Commonwealth. Additionally, Bussell argued in his RCr 11.42 motion that defense counsel was ineffective during the penalty phase of the

26. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *accord Gall v. Commonwealth,* 702 S.W.2d 37 (Ky.1985).

27. *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064.

28. *Haight v. Commonwealth,* 41 S.W.3d 436, 441 (Ky.2001) (*citing Strickland, supra* ).

29. *United States v. Morrow,* 977 F.2d 222, 229 (6th Cir.1992).

30. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

31. *Id.*

32. *Haight,* 41 S.W.3d at 441 (*citing Gilliam v. Commonwealth,* 652 S.W.2d 856, 858 (Ky. 1983)).

33. *Id.* at 442 (*citing Strickland, supra* ).

34. *Id.* at 441–42; *see also Morrow, supra; Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

35. *Id.* (*citing Sanborn v. Commonwealth,* 975 S.W.2d 905 (Ky.1998); *McQueen v. Commonwealth,* 721 S.W.2d 694 (Ky.1986); *McQueen v. Scroggy,* 99 F.3d 1302 (6th Cir.1996)).

36. *Id.* (*citing Dorton v. Commonwealth,* 433 S.W.2d 117, 118 (Ky.1968)).

trial because it put forth no mitigating evidence despite an alleged abundance of such evidence.

Specifically, Bussell alleged that Embry failed to investigate and interview Kay Bobbett and Robert Joiner. Bussell argued that had Embry investigated Joiner, he would have discovered that Joiner was mentally limited; that he was routinely taken advantage of by neighbors and Bobbett; that he told at least three different versions of his story to Sgt. Over regarding the ring allegedly sold to him by Bussell; that his trial testimony directly contradicted his statements to the 911 operator and the police; that he had a bad reputation for truthfulness in the community; and, that he had told Bobbett the location of Lail's body before it was discovered. Bussell also argued that had Embry investigated Bobbett, he would have discovered that she took advantage of Joiner and also lied during her testimony that she had only received one other ring from Joiner when in fact she had received two other rings from him before being given the ring found to have been stolen from Lail.

Bussell also alleged that Embry failed to offer the statement of the victim's daughter-in-law, Patty Lail, during the trial despite the fact that a copy of her statement was found in the case file. Patty Lail's statement directly contradicted testimony offered by her husband, Mrs. Lail's son Webb Lail, that Webb had seen the sapphire ring only a week before Lail disappeared. Patty, however, stated to police that Lail had not shown the ring to her or Webb at any time during the week before her disappearance. The RCr. 11.42 court commented that "[w]ith Patty Lail's statement coming to light, even had Bussell stolen the ring, a credible argument that the ring was not stolen when Mrs. Lail was killed could have been made. . . . It is disturbing and certainly pertinent to our inquiry that defense counsel had a key piece of evidence within his possession, but his investigation was so deficient he failed to review reasonably his own case file."

Bussell further claimed that Embry failed to reasonably educate himself in the various forensic fields and thus his future decisions to retain experts in these fields was unreasonable. During Bussell's trial, the Commonwealth employed experts from the Kentucky State Police (KSP) Crime Lab to testify concerning tree bark found near Lail's body as well as on the damaged fender of Bussell's car, automobile paint found on the tree, and hair and fiber analysis of samples taken from Bussell's car and Lail's home. However, during the RCr 11.42 hearing, Bussell presented testimony from two experts in these same fields, Dr. Richard Saferstein and Dr. Terry Connors, which discredited that offered by the Commonwealth's experts.

Doctor Saferstein, former Director of the New Jersey State Police Crime Lab, testified that the analysis of the paint evidence by the Commonwealth's expert Laurence King was "erroneous," was not "scientifically valid" and was a "false characterization" of the evidence. King had testified during Bussell's trial that the samples of paint from Bussell's car and from the damaged tree were identical regarding the top two layers of paint. The circuit court found that "Mr. King's ultimate conclusion was contradicted by the facts and by his own testimony."

Doctor Saferstein also disagreed with the hair and fiber analysis conducted by Linda Winkle of the KSP Crime Lab. Of the four hairs found in Bussell's car that Winkle reported were "similar" to Lail's hair, Dr. Saferstein testified that three of the comparisons were not valid, finding that one was "not a valid comparison," that he "fervently disagreed" with Winkle's

comparison of another, and that the third was "of limited value" given the fact that it was white in color, making it inappropriate for comparison. Doctor Saferstein was unable to analyze the fourth hair because the Hopkinsville Police Department had lost the hair. Additionally, Dr. Saferstein found Winkle's approach to hair comparison "quite disturbing" and that there was no indication in Winkle's notes that a comparison microscope had been used, which in his opinion was a very basic notation he would have expected to see. In essence, Embry failed to consult an expert in this area and failed to request Winkle's bench notes detailing her analysis.

Finally, Dr. Saferstein testified that the analysis of fibers found in Bussell's car and compared to fibers from the housecoat Lail was wearing when her body was discovered was "preliminary at best." Lonnie Henson of the KSP Crime Lab had testified that the fibers were the same. Saferstein disagreed, noting that Henson used a stereoscopic microscope to conduct the comparison and that this was the wrong type of microscope to use for fiber comparison, although Henson testified at Bussell's trial that he used a comparison microscope. Embry, however, failed to address this contradiction to limit Henson's credibility. Moreover, Dr. Saferstein's statement that Henson's comparison was preliminary was based on the fact that Henson did not conduct microspectrophotometry analysis of the fibers. Doctor Saferstein further testified that he could have rendered these same opinions in 1991.

Doctor Terry Connors testified at the hearing as an expert in tree and wood identification and found that the samples were suitable for analysis, contrary to King's testimony on behalf of the Commonwealth at Bussell's trial. Doctor Connors further testified that he conducted the tests himself, using a method of analysis that has been generally accepted in the scientific community since at least 1970, and concluded that no one could say to any degree of certainty that the bark on Bussell's car came from the tree located near where Lail's body was discovered. In fact, Dr. Connors noted that the bark on Bussell's car could have come from any one of seven species of tree.

After reviewing the evidence, the circuit court found "that Embry's failure was a result of his failure reasonably to investigate and interview prospective witnesses." Moreover, it found that "[t]he scientific evidence presented in November 1991 was not nearly as compelling as the jury was led to believe.... If Embry had educated himself, his decision not to consult an independent expert could have potentially been described as tactical. However, there is no evidence that Embry made such an attempt. Therefore, his decision cannot be described as tactical." Ultimately, the court found that Bussell had established, in his RCr 11.42 hearing, that "the Commonwealth's scientific evidence could have been controverted."

In reviewing the record before us, we cannot say that the trial judge erred in finding Bussell's trial defense counsel deficient such that he was deprived of a fair trial. Embry's performance during both the guilt phase and penalty phase of Bussell's trial fell below an objective standard of reasonableness. Moreover, we discern no error in the trial court's view that but for Embry's deficiencies, the result of the trial would have been different. Thus, both prongs of the test set forth in *Strickland, supra*, have been satisfied. Bussell was deprived of effective assistance of counsel during the guilt phase of his trial, entitling him to a new trial.

On this appeal, the Commonwealth argues that Bussell was effectively assisted

by counsel during the penalty phase of his trial, and thus is not entitled to a new penalty phase. However, the circuit court's order specifically granted Bussell a new trial due to ineffective assistance of counsel during both the guilt and penalty phases of the trial. Although we have found Bussell's trial counsel ineffective in his representation during the guilt phase of the trial, we will nonetheless address the Commonwealth's arguments.

 This Court has held that "defense counsel has an affirmative duty to make reasonable investigation for mitigating evidence or to make a reasonable decision that particular investigation is not necessary." [37] In evaluating whether defense counsel has discharged this duty, the court must determine "whether a *reasonable investigation* should have uncovered such mitigating evidence." [38] If so, then the court must determine if the failure to present this evidence to the jury was a tactical decision by defense counsel.[39] If the decision was tactical, it is given "a strong presumption of correctness, and the inquiry is generally at an end." [40] However, if the decision was not tactical, then the court must evaluate whether there was a reasonable probability that, but for the deficiency, the result would have been different.[41]

 Specifically, the Commonwealth argues that both Embry and Milburn were unable to locate mitigation witnesses to testify on Bussell's behalf. However, nineteen mitigation witnesses testified over the

course of the RCr 11.42 hearing. Despite Embry's and Milburn's claim that they did not know how many siblings Bussell had and that they were unable to locate them, they had in their possession a Kentucky Correctional Psychiatric Center report, which listed all eleven of Bussell's siblings and the towns in which they lived. Furthermore, Embry testified at the RCr 11.42 hearing that he never sought medical, school, employment or jail records. As the circuit court found, "Embry was unable to show the jury that Bussell had a single positive character trait because he had not taken the time to find if he possessed any."

The Commonwealth argues that Bussell was uncooperative in assisting his defense team in mounting a proper mitigating case during Bussell's sentencing. Although Embry testified at the hearing that Bussell was uncooperative and that the only mitigation evidence they had was residual doubt, we have specifically held residual doubt not to be a mitigating factor.[42]

 Moreover, Bussell's uncooperativeness did not relieve Embry of his duty to conduct a reasonable investigation for mitigating evidence. Initially, we note that defense counsel is required to abide by the wishes of his or her client.[43] Furthermore, counsel may not be constitutionally ineffective for failing to present mitigating evidence at the penalty phase of the trial "in deference to the defendant's instructions to forego presentation of such evidence." [44] And, the decision not to con-

**37.** *Hodge v. Commonwealth,* 68 S.W.3d 338, 344 (Ky.2001).

**38.** *Id.* (emphasis in original) (citation omitted).

**39.** *Id.*

**40.** *Id.*

**41.** *Id.*

**42.** *Thompson v. Commonwealth,* 147 S.W.3d 22, 50 (Ky.2004).

**43.** SCR 3.130—1.2(a).

**44.** *Tyler v. Mitchell,* 416 F.3d 500, 503–04 (6th Cir.2005), *cert. denied,* 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 334 (1990); *see also Foley v. Commonwealth,* 17 S.W.3d 878 (Ky. 2000) (finding that counsel's decision not to

duct an investigation into a defendant's background in search of mitigating evidence may be supported by reasonable professional judgment.[45] However, "the investigation must still be reasonable under the totality of the circumstances."[46]

Based on the findings of the circuit court, there was not a reasonable investigation into Bussell's background in an attempt to find mitigating evidence. Had Embry made a reasonable investigation, he would have discovered the evidence necessary to present a proper mitigation case during Bussell's sentencing.[47] Furthermore, such a decision cannot be described as merely tactical, as the record does not support the conclusion that Embry or Milburn even attempted to ascertain whether all possible mitigating evidence might actually assist their client. Moreover, there is a reasonable probability that, but for Embry's deficient performance during the penalty phase of the trial, the outcome would have been different.[48] Quite simply, Embry and Milburn failed to present a mitigation case. Thus, the circuit court did not err in finding that Bus-

sell was also deprived of effective assistance of counsel during the penalty phase of his trial.[49]

## CONCLUSION

For the reasons set forth herein, we find no fault with the circuit court's determination that the Commonwealth deprived Bussell of a fair trial by failing to disclose evidence favorable to Bussell and material to his guilt or innocence in violation of *Brady, supra.* Furthermore, this Court affirms the circuit court's determination that Bussell was deprived of effective assistance of counsel during both the guilt and penalty phases of his trial. On these grounds, Bussell shall have a new trial.

All sitting, except SCOTT, J. All concur.

---

call mitigation witnesses was a result of discussions with the defendant and trial strategy), *overruled in part on other grounds, Stopher v. Conliffe,* 170 S.W.3d 307 (Ky.2005).

**45.** *See Fretwell v. Norris,* 133 F.3d 621, 627 (8th Cir.1998); *see also Fisher v. Angelone,* 163 F.3d 835 (4th Cir.1998).

**46.** *Stevens v. Zant,* 968 F.2d 1076 (11th Cir. 1992).

**47.** *Strickland, supra.*

**48.** *Id.*

**49.** In part 2 of this opinion, we have recounted numerous instances of deficient performance of trial counsel as found by the trial

court. The trial of this case was in November of 1991. As reflected in this Court's opinion in *KBA v. Embry,* 152 S.W.3d 869 (Ky.2005), in and around that time, Embry was divorced from his wife, one of her children died of a brain injury, and her other child went to prison. In November, 1991, Embry's father died and he moved in with his mother as her caretaker. During this time, he became addicted to crack cocaine. Ultimately, he was discharged from his employment, and his mother died of neglect for which Embry was charged and pled guilty to second-degree manslaughter. Ultimately, Embry was permanently disbarred.